**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

--------------------------------

LISA ROWLAND                                   :
                                               :
                    Plaintiff,                 :          Civ. No. 05-2293 (DRD)
          v.                                   :
                                               :
                                               :
JO ANNE B. BARNHART                            :
COMMISSIONER OF SOCIAL                         :          **O P I N I O N**
SECURITY,                                      :
                                               :
                    Defendant.                 :
--------------------------------

Agnes S. Wladyka, Esq.
Abromson & Carey
60 Park Place, Suite 601
Newark, NJ 07102
          Attorney for Plaintiff


Karen M. Ortiz
Special Assistant United States Attorney
c/o Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
          Attorney for Defendant


**DEBEVOISE, Senior District Judge**

          Plaintiff, Lisa Rowland ("Plaintiff"), appeals from a final determination of the

Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Disability

Insurance Benefits ("DIB") under the Social Security Act ("the Act").  Plaintiff contends that the

1

Administrative Law Judge's determination to deny her application for DIB was not supported by substantial evidence, and that, on the contrary, substantial evidence exists that Plaintiff was disabled as of December 31, 1996, her date last insured.

### PROCEDURAL HISTORY

On August 1, 2003, Plaintiff Lisa Rowland filed an application for DIB alleging disability as of August 12, 1993.  Plaintiff's application was denied initially and again upon reconsideration.  (R. at 46).  Plaintiff then requested a judicial hearing to review the application, which was held before Administrative Law Judge Michal Lissek (the "ALJ") on November 18, 2004.  (R. at 228).  The ALJ denied Plaintiff's application on December 6, 2004, finding that she did not suffer from a disability as of her date last insured.  (R. at 11-19).  On December 9, 2004, Plaintiff submitted a request for review of the ALJ decision by the Appeals Council.  (R. at 9-10).  This request was denied on April 8, 2005.  (R. at 4-6).  Plaintiff filed this Complaint on April 29, 2005.

### FACTS

Plaintiff is a 42 year-old housewife and mother of two children.  She first applied for DIB in 2003 (T.46-48), although her alleged onset of disability began in 1993.  She testified during the hearing that she had not applied for benefits earlier because she mistakenly believed that applicants were means-tested, and she assumed her husband's income made her ineligible.  (R. at 235).  The parties do not dispute that Plaintiff's date last insured was December 31, 1996.

In 1986, Plaintiff experienced dizziness, and later, blurry eyes. Although she was treated for other ailments, in hindsight it was concluded that these were early symptoms of Multiple Sclerosis ("M.S.").

2

In 1993, Plaintiff again experienced blurred vision, and sought advice from a number of eye specialists.  (R. at 240-241).  One of the ophthalmologists with whom she consulted suggested her problem might be an early indicator of M.S.  (R. at 241).  On August 11, 1993, the results of a subsequent MRI examination of her brain revealed multiple white matter lesions consistent with a diagnosis of Multiple Sclerosis.  (R. at 112).

## A. Plaintiff's Work History

After graduating from college in 1986, Plaintiff worked as a mortgage processor at two different financial institutions for approximately four years.  Her duties in this position consisted of entering mortgage application details into the computer system, following up with customers if paperwork was missing, organizing appraisals and setting up closings. (R. at 239).

In 1990, Plaintiff was hired by a pharmaceuticals company as a receptionist.  (R. at 70). Her duties at the firm included helping with the mailings, phoning doctors' offices to verify that they had adequate surgical supplies, and general office organization. She was occasionally required to check inventory levels at the warehouse. . She was laid off after approximately 12 months.  (R. at 238).

## B. Medical Evidence Prior to 31 December 1996

Plaintiff testified that during 1986 and 1987 she experienced bouts of vertigo.  (R. at 239-240).  In the following years, she frequently suffered from blurred vision.  (R. at 240).  In 1993, she was treated for Lyme Disease.  (R. at 131).

Subsequent to her diagnosis of M.S., Plaintiff gave birth to her first child without incident, in August 1994.  (R. at 128).  Plaintiff testified that this coincided with increased difficulties with walking and writing, and chronic fatigue.  (R. at 252-253).

3

In February 1996, an MRI examination revealed that Plaintiff's M.S. had progressed, with demylenation observable in the superior cervical spine.  (R. at 111).  Following a reported exacerbation (a rapid onset attack of increasing M.S. symptoms) in January 1996, Plaintiff had begun taking medications to treat the disease.  She was placed on a tapered dosage of Prednisone, an oral steroid, after which Dr. Judith Lustig reported that "she did improve."  (R. at 128).  Dr. Lustig's neurological examination of Plaintiff on September 11, 1996 indicated that she had responded badly to Betaseron, but then switched to Avonex, and is "really doing well on it." Dr. Lustig's report also mentioned that the optic neuritis from which Plaintiff suffered in 1993 responded to treatment, and "got progressively better over eight months."  (R. at 128).  Plaintiff reported weakness in her right leg, and Dr. Lustig observed that Plaintiff had developed a narrow-based gait.  Plaintiff also complained of excessive fatigue and increased urinary frequency that started in January 1996.

Dr. Lustig examined Plaintiff again in December 1996. She noted that her M.S. was clinically stable, and that Plaintiff had reported "no problems recently."  (R. at 127).

### C. Medical Evidence Post 1996

Plaintiff underwent an MRI examination of her brain in February 1997. The results were compared to those of an MRI from February 1996, and showed no appreciable change in the size of the lesions caused by demyelination.  (R. at 110).  A further MRI examination in January 1998 suggested the demyelinating process was beginning to accelerate. (R. at 113).

In September 1997, Dr. Lustig observed a mild worsening of Plaintiff's M.S.-related symptoms, including deteriorating vision and numbness in her right foot (R. at 118).  Another neurologist, Dr. David Blady, examined Plaintiff in February 1998, and reported that her gait was

4

worsening.  (R. at 133-134).  He also noted that Plaintiff informed him that she was functioning well despite her fatigue.  Plaintiff gave birth to a daughter in April 1999.  (R. at 48).

Between November 1999 and January 2002, Plaintiff was examined on several occasions by Dr. Larry Frohman, Director of Neuro-Ophthalmology at the New Jersey Medical School (R. at 140, 144, 149-150, 157-158, ).  He noted that Plaintiff's optic neuritis had improved over time but never completely recovered.  (R. at 157).  He also reported that Plaintiff's vision deteriorated during this period, but that an adjustment to her glasses prescription would enable her to continue to drive.  (R. at 140).

From November 1999 to June 2002, Plaintiff was treated regularly by Dr. Stuart Cook for her ongoing symptoms of M.S..  (R. at 141-142, 145-148, 151-152).  These symptoms included her worsening gait, the onset of lymphadenopathy, and fatigue, as well as non-responsiveness to medication . Plaintiff began developing urinary problems during this period.  Her urologist, Dr. Yitzhak Berger, prescribed medications for her bladder symptoms and taught her self-catheterization.  (R. at 139).  In a follow-up examination in February 2003, Dr. Berger reported that Plaintiff's symptoms of M.S. were continuing to deteriorate.  (R. at 165).  Her overall condition was assessed by her general physician, Dr. Machteld Hillen, who reported in September 2002 that Plaintiff denies severe pain; does not suffer from convulsions or depression; has no difficulty speaking, swallowing or breathing; but experiences double vision, significant difficulty in walking, and fatigue.  (R. at 193).

### DETERMINATION OF DISABILITY AND BURDENS OF PROOF

The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The individual's physical or mental impairments must be of such severity that he is not only unable to do his previous work but also cannot, considering age, education and work experience, engage in any other kind of substantial gainful employment. 42 U.S.C. § 423(d)(2)(A).

The plaintiff bears the burden of proving that she is unable to return to her former occupation. *Dempsey v Comm'r of So. Sec.*, 59 Fed. Appx. 496, 497 (3d. Cir. 2003). Once the plaintiff has satisfied this initial burden, "the burden of proof shifts to the Secretary to show that the claimant, given her age, education, and work experience, has the capacity to perform specific jobs that exist in the national economy." *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

The Commissioner of Health and Human Services has promulgated a five-step analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520. The adjudicator first considers whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is working and the work involves substantially gainful activity, her application for disability benefits is automatically denied. *See* 20 C.F.R. § 404.1520(b). If not, step two of the analysis requires determining whether the claimant has a severe impairment, namely, any impairment or combination of impairments that significantly limits the claimant's ability to engage in basic work activities. 20 C.F.R. § 404.1520(c).

If the ALJ finds that the claimant is not working and suffers from a severe mental or physical impairment that also satisfies the duration requirement of 20 C.F.R. § 404.1509, she then proceeds to step three of the analysis. Here the ALJ determines whether the medical evidence of the individual's impairment or combination of impairments satisfies the duration

requirement and is equivalent to one or more of the impairments listed in Appendix 1.  20 C.F.R. § 404.1520(d).

If the claimant's impairment or its equivalent is not listed, the ALJ moves on to step four. Here, the ALJ determines whether the claimant has the necessary "residual functional capacity" to return to her former line of work.  20 C.F.R. § 404.1520(d).  Residual Functional Capacity ("RFC") is defined as "the most you can still do [in a work setting], despite your limitations," which may be physical and mental, and arise out of the claimant's impairment, and "any related symptoms, such as pain."  20 C.F.R. § 404.1545.   The claimant bears the burden of showing that she is unable to return to her past relevant work.  *Adorno v. Shalala*, 40 F.3d 43, 46 (3rd Cir. 1994).

Step four involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's RFC; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the claimant's RFC to her past relevant work to determine whether claimant has the level of capability needed to perform that work. *Burnett v. Commissioner of SSA*, 220 F.3d 112 (3d Cir. 2000)..

If the ALJ concludes that the claimant lacks the RFC to return to her former work, the evaluation moves to its final step.  The burden now shifts to the Commissioner, who must show that the claimant is able to perform other forms of work, thus negating a claim of disability.  20 C.F.R. § 404.1520(g).  The ALJ must show that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she

is capable of performing work and is not disabled." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

If the ALJ positively identifies the claimant's impairment (or equivalent) within the listed impairments of Appendix 1, or finds that the claimant is unable to engage in any kind of gainful employment, she will determine that the claimant is disabled..

### *Administrative Decision*

The ALJ determined that Plaintiff's medical evidence failed to show that, as of her date last insured of December 31, 1996, her impairment was sufficiently severe to support her application for Disability Insurance Benefits.  (R. at 14-19).

Proceeding through the five-step analysis described above, the ALJ first noted that Plaintiff had not been gainfully employed since the onset of her alleged disability in August 1993. At step two, the ALJ found that Plaintiff's multiple sclerosis did constitute a severe impairment in satisfaction of 20 C.F.R. § 404.1520(c).

At the third step, the ALJ found that Plaintiff's impairment did not "meet or medically equal, either singly or in combination," one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  In evaluating the evidence presented by Plaintiff, the ALJ concluded that her impairment had not reached "a level of severity of multiple sclerosis which was compatible with section 11.09 through December 31, 1996." (R. at 16).  To support this finding, the ALJ cited, as of her date last insured, Plaintiff's stable pattern of demyelination; the improvement of her optic neuritis and her generally good vision; her positive response to medications prescribed for treating her M.S. symptoms; her normal motor strength and coordination; and absence of substantial muscle weakness.

Having determined that Plaintiff's impairment did not rise to the level of an impairment listed in Appendix 1, the ALJ proceeded to step four. Here, she defined Plaintiff's RFC as an ability to "sit up to 6 hours in an 8 hour work day; stand and walk up to 2 hours in an 8 hour work day; and lift and carry up to 10 pounds." (R. at 18.) She found that Plaintiff's prior work as a receptionist and mortgage processor were essentially desk jobs with only occasional walking or standing required. On this basis, she concluded that Plaintiff did possess the requisite RFC, as of her date last insured, to perform her past relevant work. (There is no evidence to suggest, nor does Plaintiff argue, that she was laid off because her condition left her unable to fulfill the tasks required of her. In her testimony (R. at .238), she notes that "there were other people fired, also.") As Plaintiff was unable to show that she lacked the RFC to perform her prior work, the ALJ ruled that Plaintiff was not disabled as of December 31, 1996.

## *DISCUSSION*

### A. Standard of Review

The findings of fact of the Commissioner of Social Security in determining eligibility for disability benefits shall be conclusive if supported by "substantial evidence." 42 U.S.C § 405(g). Substantial evidence must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). If the evidence in the record supports more than one reasonable interpretation, deference is given to the Commissioner's findings. *Haseler v Acting Comm'r of Soc. Sec.*, 33 Fed. Appx.631 (3d. Cir. 2002).

However, if the Commissioner's decision is not supported by substantial evidence, the District Court has the power to modify or reverse it. 42 U.S.C § 405(g). Furthermore, courts

have mandated that leniency be shown in establishing a claimant's disability.  Although the

burden is on the claimant to prove his disability, "a more tolerant standard" ought to be used in

disability application hearings than would otherwise apply "where the adversary system

prevails."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d. Cir. 1979).

## B. Evaluation of the ALJ's Findings

In the present case, Plaintiff generally argues that the ALJ's decision denying her

Disability Insurance Benefits was not supported by substantial evidence.  She contends that (i)

the ALJ improperly evaluated the medical evidence provided; (ii) the ALJ's finding that

Plaintiff's impairment was not one of the listed impairments in Appendix 1 was incorrect; and

(iii) the ALJ's finding that Plaintiff is capable of performing her prior work was incorrect as a

matter of law.

In the first instance, Plaintiff asserts that the ALJ failed to give sufficient credence to her

testimony, backed by medical reports, regarding her general weakness, decreased sensation,

numbness, limitation of motor and function, altered gait, dizziness and fatigue, visual deficit,

urinary complications, and mental impairments, including lack of concentration and lack of

focus.

The ALJ made her credibility assessment in part based on Social Security Ruling 96-7p.

This ruling requires that, given the existence of a medically determinable physical or mental

impairment that could cause the claimant's symptoms, the intensity, persistence and functionally

limiting effects of the symptoms must be evaluated to determine the impact on the claimant's

ability to do basic work activity.  This requires the adjudicator to make a finding of fact on

credibility.  (Matthew Bender, 1-9 Social Security Practice Guide § 9.03.)

Furthermore, a simple statement that the claimant's allegations are or are not credible will not suffice for a finding of fact on credibility. The finding of fact must contain specific reasons for the finding on credibility, supported by the evidence in the case record and must be sufficiently specific to make clear to the claimant and to the subsequent reviewers the weight the adjudicator gave the individual's statements and the reasons for that weight.

The ALJ's assessment that "the claimant's subjective complaints of disabling fatigue and other symptoms and limitations precluding all significant work activity through December 31, 1996 are not fully credible or consistent" conforms with the requirements of SSR 96-7p.  She notes that although Plaintiff was diagnosed with M.S. back in 1993, her condition remained stable through her date last insured. The medical evidence provided by Plaintiff for the period through the end of 1996 showed incidents of debilitation, but not the persistence, intensity and duration of symptoms required by Appendix 1.  She experienced an exacerbation in January 1996, but responded well to medication.  Her optic neuritis responded to treatment and progressively improved; indeed her visual acuity was 20/20 in September 1996.  She gave birth to her son in August 1994, and raising him no doubt contributed to her fatigue in the subsequent months.  Nevertheless, she was able to walk and carry him without assistance, and in spite of the gait she was starting to develop.

Plaintiff's testimony also reveals that in 1996 and 1997 she was able to drive her son to and from pre-school, perform light housekeeping, shop with her son at the supermarket, and put the groceries away when she returned home.  (R. at 245-50).

Dr. Lustig reported in December 1996 that Plaintiff's M.S. was clinically stable, with Plaintiff reporting "no problems recently".  There is no evidence that she suffered abnormal pain

11

during this period.

The ALJ found that "while clearly [Plaintiff's] disease progressed to a debilitating level by September 2003, this was not the case through December 31, 1996."  The medical evidence provided by Plaintiff substantially supports this finding, as the majority of this evidence actually dates from 1997 and thereafter.  This evidence includes an MRI from January 1998 showing accelerating demyelination, as well as documented symptoms of deteriorating vision, worsening gait and urinary problems, increasing numbness in her right foot, and difficulty in walking and fatigue.  It seems safe to say that, had she been insured during this time, Plaintiff's eligibility for DIB would be more likely.  However, the relatively low level of severity of her symptoms through the date she was last covered by insurance precludes such a finding in this case.  See *Jones v. Comm'r of Soc. Sec.*, 48 Fed. Appx. 369 (3d. Cir. 2002) (where the court rejected Plaintiff's appeal of a DIB denial, which she lodged after re-fracturing her ankle following the expiration of her insurance coverage.  Plaintiff contended that the new fracture constituted additional proof of the extent of her alleged disability arising from the original fracture that occurred during her insurance eligibility period.)

Plaintiff further alleges that the ALJ, in proceeding through step three of the five step analysis outlined in 20 C.F.R. § 404.1520, incorrectly held that Plaintiff's impairment was not a listed impairment in Appendix 1.  Section 11.00D of Appendix 1 states that for conditions that are episodic in nature, such as multiple sclerosis, "consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals."  11E requires that the evaluation of the magnitude of the impairment must consider the severity of the resulting muscle weakness.

Section 11.09 lists the major criteria for evaluating impairments caused by M.S..  A

person with M.S. will have a listed impairment for purposes of 20 C.F.R. § 404.1520 if they

present any of the following symptoms:

(i) Disorganization of motor function.  This is defined in 11.04B as "significant and

persistent disorganization of motor function in tow extremities, resulting in sustained disturbance

of gross and dexterous movements, or gait and station." 11.00C notes that the assessment of

impairment depends on the degree of interference with locomotion and/or interference with the

use of fingers, hands, and arms;

(ii) Visual or mental impairment.  Section 2.02 requires that any impairment of visual

acuity must be such that the remaining vision in the better eye after best correction must be

20/200 or less.

(iii) Significant, reproducible fatigue of motor function with substantial muscle weakness

on repetitive activity.

The ALJ found Plaintiff's multiple sclerosis was "severe ... but not severe enough"

through her date last insured.  This finding is consistent with an evaluation of the evidence

presented by Plaintiff.  Plaintiff reported only one exacerbation of her M.S. during the insured

period, for which she took medication and responded well, according to Dr. Lustig.  Although

she had developed a narrow-based gait, she was still able to walk independently. On this basis,

the ALJ reasonably concluded that her resulting muscle weakness was not substantial.

Similarly, Plaintiff's visual impairment did not reach the severity level required by

Section 2.02.  While observing a slight sluggish reaction in her right eye as a result of the earlier

bout of optic neuritis, Dr. Lustig reported that Plaintiff's visual acuity in September 1996 was

20/20.  The ALJ reasonably held Plaintiff's ophthalmologic problems "did not interfere with her ability to function" prior to December 31, 1996.

Finally, the ALJ found that although Plaintiff's assertions of fatigue "are reasonable to a degree," the evidence does not show that it was debilitating to the extent required by Section 11.09, as it was not "significant" or accompanied by "substantial muscle weakness on repetitive activity." This was a reasonable conclusion in light of Plaintiff's own testimony that she was able to raise her son and carry him around without assistance through 1996.

Plaintiff further alleges that the ALJ's RFC assessment at step four of the five step disability determination analysis, namely her finding that Plaintiff was capable of performing her past relevant work, was incorrect as a matter of law.  Under 20 C.F.R. 404.1545, an assessment of an individual's RFC required the ALJ to determine "the most [Plaintiff] can do" despite her limitations.  20 C.F.R. 404.1545(a)(1).  This determination must be based on "all of the relevant medical and other evidence" provided by the claimant.  20 C.F.R. 404.1545(a)(3).  The claimant's "ability to meet the physical, mental, sensory, and other requirements of work" must be considered.  20 C.F.R. 404.1545(a)(4).  In analyzing the claimant's physical abilities, the ALJ must first assess the nature and extent of her physical limitations, "and then determine [her] residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. 404.1545(b).

The ALJ determined that Plaintiff retained the ability to sit for up to six hours in an eight-hour work day, to stand and walk around for up to two hours, and lift and carry ten pounds.  In making her RFC assessment, the ALJ relied on the lack of evidence of substantial muscle weakness or fatigue; Plaintiff's positive response to Avonex during 1996; the improvement in

14

her vision over that period; and her ability to walk and carry her young son without assistance.  In her memorandum of law, Plaintiff herself notes that multiple sclerosis is an "insidiously progressive" disease.  (Pl's M.O.L. at 21).  Plaintiff's testimony and evidence fail to show that, as of December 31, 1996, the disease had progressed sufficiently to prevent her from performing her prior, largely sedentary work.  While the ALJ did not make independent findings as to the nature of Plaintiff's past work, her own testimony acknowledges that it was largely "deskwork," with only occasional inventory checks that required her to be on her feet.  (R. at 238).

Plaintiff also makes repeated references to her severe and disabling pain throughout her memorandum of law.  Again, however, there is no evidence that Plaintiff experienced debilitating pain through her date last insured of December 31, 1996, and, in fact, the medical records negate such pain.

Thus, the ALJ's conclusion that Plaintiff retained the capacity to perform her past work as a mortgage processor or office assistant on an ongoing basis was justified.

### CONCLUSION

For the reasons stated above, the decision of the ALJ is supported by substantial evidence, and is therefore affirmed.  The court will file an appropriate order.

 /s/ **Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:      10 October, 2006